Case number 17-1185, Julia Julie Barlia v. MWI Veterinary Supply Inc. Oral argument not to exceed 15 minutes per side. Ms. Lord for the appellant. Ms. Lord, you can proceed. Good afternoon. My name is Jennifer Lord and I'm appearing on behalf of the appellant, Julie Barlia. The trial court aired when it made the critical mistake of conflating the terms impairment with diagnosis. It's important to note that nowhere in the act is the word diagnosis even used. Even more telling, the definition of an impairment refers solely to a condition or a disorder that affects a bodily system. Again, that definition does not use the word diagnosis. There are practical ramifications of this mistake, this conflation of impairment and diagnosis. And I'd like to explain a few of the practical ramifications to litigants. If the court accepts Judge Rosen's interpretation of what is required to establish a disability, a plaintiff during the discovery phase would be required to take the deposition of their own treating physician, would be required to authenticate the medical records. That is a trial task, not a discovery task. And, in fact, Judge Rosen spent quite a bit of time, in his opinion, criticizing and questioning the authenticity of the underlying medical records. All that's required under the amended ADA is that the plaintiff bring forth sufficient evidence to demonstrate that a jury could find a disability. By grafting this diagnosis requirement, Judge Rosen not only failed to apply the amended ADA, he has made the ADA even more difficult. What he did when he ignored the plaintiff's medical evidence was that he made a determination, as a matter of fact, that she was not disabled under the law. He ignored plaintiff's extensive testimony about her disability, the fact that she had lost 17 pounds in a very, very short period of time, that she was suffering from peripheral neuropathy, that she experienced decreased mental acuity. Judge Rosen also did not consider, with any appropriate weight, the physician's note that Ms. Barlia submitted in January of 2014, less than six months prior to her termination. And that note was important. It specifically referred to a thyroid disorder. Again, disorder, condition, not diagnosis. And finally, in not looking at the medical records in the light most favorable to the plaintiff, he made that finding a fact that was incorrect. And if the court is so inclined, I invite you to look at those sealed records. Page after page after page refers to an active thyroid condition. And there's another important element here that the trial court ignored, and that was that the appellee, specifically Ms. Barlia's direct supervisor, Terry Walsh, had actual knowledge of her disability. Not only did the two of them discuss the actual disability for years at a time, because Mr. Walsh's wife also suffered from a thyroid disorder, but Mr. Walsh was present with Ms. Barlia on a drive-along in December of 2013. Again, less than six months, approximately six months prior to the termination. And during that drive-along, Ms. Barlia experienced a flare-up that was so severe, it caused her dizziness, they had to pull over, and Mr. Walsh resumed the driving for the rest of the day-long ride-along. Once we get past the issue of whether or not Judge Rosen appropriately found that Ms. Barlia was not disabled as a matter of law, he proceeded to analyze whether or not she had met her prima facie case. And the court also erred there in several important respects. Ms. Barlia was qualified, and under this court's precedent, in Wexler v. White's Fine Furniture, the examination that is important is whether or not the plaintiff, Ms. Barlia, met the objective qualifications for the job. Did she have the experience? Did she have the education necessary? She had been working at this job with the appellee since 2008. So the appellee in their presentation is confusing their critique of her performance with what the law says the proper analysis for the qualification factor is. Finally, the next factor I briefly addressed earlier, the employer's knowledge. So besides Mr. Walsh's actual knowledge of Ms. Barlia's medical condition, the company had knowledge going back to 2010. In 2010, Ms. Barlia was required to take a family medical leave act due to her thyroid disorder and her conditions. And she provided FMLA paperwork in connection with that request. She provided a doctor's note. So the company was clearly on notice via multiple means. Finally, was she signaled out for discharge for impermissible reasons? She was, and plaintiff has set forth abundant evidence of pretext. And the pretext comes in the form of the discussion of her most clear comparator, Mr. Kloosterman. Now Mr. Kloosterman and Ms. Barlia did the exact same job. Mr. Kloosterman received a plum territory assignment. The territory assignment was culled from Ms. Barlia's most profitable accounts, her top two most profitable accounts, and nine of her 25 most profitable accounts. And as a result of giving Mr. Kloosterman those accounts, Ms. Barlia suffered a net revenue loss of over $700,000. Now the testimony from Mr. Walsh's boss, a vice president, was that it could take up to a year, sometimes more, to recover from such a significant territory adjustment. And that's precisely what Ms. Barlia was doing in those later months. Back to the pretext discussion. When an objective comparison between Ms. Barlia and Mr. Kloosterman is made, Ms. Barlia clearly outperforms Mr. Kloosterman on an objective basis. What about the point that I believe MDI noted that Kloosterman maybe had better communication with his employer than Ms. Barlia did? That is disputed as well. Ms. Barlia testified that until she requested the accommodation of not attending the conference in California in February of 2014, that her relationship with Mr. Walsh was excellent. So again, that is a disputed issue of fact. And the company is arguing that it terminated Ms. Barlia for objective reasons. The primary thrust of their argument is that it terminated her because of her numbers. And for that same time period, her performance was better than Mr. Kloosterman. Was Kloosterman placed on a PIP at the same time or comparable time? He was never placed on a PIP. And when I took his deposition for fiscal year 2014, he received a 1.95 overall performance evaluation, which should have targeted him for a PIP or some sort of discipline. But Mr. Walsh testified that he didn't. Again, Mr. Walsh's boss, Spencer Breithaupt, testified that he was surprised to learn that Mr. Walsh had not brought Mr. Kloosterman's poor performance to his attention because a do-not-meets-expectation overall rating was important to him. I did forget to add that I would like to reserve a minute in rebuttal,  Thank you. Good afternoon, Your Honors. I'm Jim Tucker with the Equal Employment Opportunity Commission. I'm here this afternoon to ask that you help ensure that courts within this circuit continue to apply the post-amendment ADA standards that are correct and that Congress intended to be applied under the question of whether or not an individual has a disability. As this district court's decision has shown, courts are continuing to mistakenly apply the pre-amendment standards that Congress expressly rejected with its amendment of the statute. Specifically getting to the question, for example, of whether or not there's a major life activity, the court recognized or stated that there was no evidence of such here, even though Ms. Barley had alleged that she had an endocrine disorder. And the amended statute provides specifically that the function of the endocrine system is a major life activity. Similarly, the statute provides, or the statute and the regulations after the amendment provide, that the function of the, or any disorder that affects the endocrine system is itself to be considered an impairment. Again, the district court stated that there was no evidence of an impairment, but that's simply incorrect, and it's following a different standard, not tracking what is the correct standard after the amendments. Turning to the question of substantial limitation, the court again failed to acknowledge that with the amendments, the intent was to, of Congress, was to enact standards that required a lower level of functional limitation than had been required previously. There's no longer a requirement to show that the individual was precluded from performing a major life activity or was significantly or even severely limited. Instead, it's just this notion of a substantial limitation that's lesser than the standards prior to the amendments. In this case, however, the district court applied a standard that did not adhere to this. It also treated Ms. Barley's testimony as insufficient categorically to establish substantial limitation, stating that medical evidence was required. And again, the statute specifically states, the statute and regulations after amendments state, that in the usual case, scientific, medical, and statistical analysis is not required. Again, this is consistent with Congress's intent that the analysis not focus as heavily on coverage in the post-amendment period, but rather to pass through coverage. Of course, you have to establish coverage. It's not a meaningless standard. But the real focus should be on whether or not there's been discrimination. What is the EEOC's position then as to what evidence is required? If you don't need a diagnosis, what do you need? Well, again, the Congress and the Commission's regulations do not set out a specific bright line. Every case involves an individualized inquiry into whether or not the particular individual's performance of a major life activity as compared to members of the general public results in or shows that there is a significant difference there. And I see I'm about out of time, Your Honors. If I could turn very quickly, again, we addressed that in our brief, Your Honor, and, again, it's extensive in the statute and the regulations. I just want to make one very brief point, if I may, regarding the regarded-as analysis. Courts in the circuit have been a little consistent in applying the proper post-ADA amendment standards, and we would encourage the courts to take this opportunity to clarify the correct regarded-as coverage standard. Thank you, Your Honors. But your intervention is solely on the disability basis, not on, for example, the pretext. That's correct, Your Honor. We're just expressing on the coverage issues. Thank you. Thank you, Your Honors. May it please the Court, Emily Petrosky of Jackson-Lewis on behalf of Appelli MWI Veterinary Supply. It's MWI's position that this Court should affirm the District Court's thorough and well-reasoned decision granting summary judgment in favor of MWI for the following reasons. First, Bar-Lea failed to establish that she suffered from an actual disability under the ADA, that she preserved a regarded-as claim, or that she was otherwise regarded-as disabled. Second, even assuming Bar-Lea had established the first element of her prima facie case, or that this Court were to determine that she had, summary judgment should also be affirmed on alternative grounds. First, Bar-Lea cannot establish that the relevant decision-makers were aware of her purported disabilities at the time of their decision-making. She was not qualified for her position, and there's no evidence that she was singled out for discharge as part of a reduction in force that impacted approximately 90 employees for unlawful reasons. The 90 employees is company-wide, right? There were only how many within her particular group or geographical area? There was one within her region, which was consistent with a 4% to 5% reduction company-wide. Third, the District Court properly dismissed Bar-Lea's ADA discrimination claim because even assuming she had established a prima facie case, she failed to show that the stated non-discriminatory reason for the termination of her employment was pretext for unlawful discrimination. Fourth, as to her ADA retaliation claim, the District Court correctly determined that she had failed to establish a prima facie case where she had failed to suggest a basis for forging a causal connection between her purported protected activity, her request to miss the national sales meeting, and failed to show that the non-discriminatory grounds for placing her on a PIP and terminating her were a pretext for retaliation. In terms of the termination, you seem to argue the evidence that they were going to terminate, was it definitively one person, only one person, or kind of close to one person? And then secondly, with regard to the PIP, I take it there was no numerical they could have put nobody or many people on a PIP. There was no numerical requirement for placing people on a PIP. At the time, Ms. Bar-Lea was the only individual in her region on a PIP. She was placed on that PIP before Terry Walsh had any knowledge that there was going to be any reduction in force. And in terms of the number of people in the region that were let go, what the undisputed evidence of record shows is that on May 27th, after Ms. Bar-Lea was placed on the PIP, Spencer Brightup, the VP, posed the question to Terry Walsh that if he had to let someone go as part of a reduction in force, who would it be and why? And Bar-Lea was identified at that time. And at that time, did, I guess it's Walsh or Brightup, make it as a kind of a comparative between Bar-Lea and Kloosterman or Bar-Lea and Kloosterman and others? Because their strongest argument seems to be, on this point at least, is with respect to Kloosterman. So you want to talk about that some? Certainly. With respect to Kloosterman, he was not hired until March of 2013. He did not have Bar-Lea's extensive history of a failure to meet that 95% monthly target. As of the date of her termination, she had not met that goal in 14 of 18 months. She had not met that 95% goal in 7 of the 8 months in 2014. And how had Kloosterman done? He hadn't even been employed that long. In terms of the other issue, Kloosterman was not on a PIP at that time. Terry Walsh had placed other individuals on PIPs in the past. Anybody else in his reports on a PIP at that time or only in the past? In the past. At the time of the reduction of force, she was the only individual on a PIP. But in addition to the PIP, she was the only individual with that extensive of a history of failing to meet that monthly sales goal. She was also the only individual with a history of those communication issues. Terry Walsh testified that she had become disengaged from her position and she hadn't communicated with him effectively to show that she was making an effort to improve. And how would you analyze or offset the honest belief rule against the genuine issue of material fact, which goes the other way, the question of, let's say, Kloosterman's communication skills as opposed to her? On the one hand, that would seem to be something that there might be a genuine issue of fact about how strong it was. On the other hand, employers generally assert an honest belief even if, as a matter of fact, we're wrong. So how does that cut here where you have both of those in play? Well, clearly, again, she's the only one on the PIP. Relative to any communication issue, she admitted that she had failed to effectively communicate with Terry Walsh. In January 2014... Isn't that right after where she says, but he didn't communicate with me either? Well, she's alleging that he didn't communicate with her, but in the email he had sent her in December 2013, she was instructed to let him know if he could assist. She did not communicate with him until May, even though she concedes that she was struggling with her numbers. And even then, the only reason why she communicated with him was to request a week off. So at the same time she's conceding she's struggling to meet her numbers, she's requesting additional time off. Relative to the EEOC's argument, it's notable that the EEOC is here arguing only for purposes of the standard. They didn't litigate this matter. They're not arguing for the reversal of the district court's decision. Moreover, in advancing their arguments and their briefs, the EEOC acknowledged that much of the evidence regarding Barlia's medical condition was filed under seal. Accordingly, they haven't reviewed any of that medical documentation or made any effort to do so. Also, with respect to Appellant's argument, it's important to remember that what she asserted in her complaint caused her to miss the national sales meeting was symptoms related to histamine release syndrome, mastocytosis, and adrenal insufficiency. At her deposition, however, she admitted that she'd never been diagnosed with mastocytosis or histamine release syndrome, which is why neither Barlia nor the EEOC make any reference to those conditions here on appeal, even though they were a fixture of her complaint. Further, the medical records reviewed by the district court in granting summary judgment clearly state no evidence of adrenal insufficiency. Also, relative to the self-identification form, Barlia completed a form confirming that she was not disabled within a few weeks of requesting to miss the NSM. And this is consistent with the court's decision in Neely that a bare assertion of sleep apnea    that a bare assertion of sleep apnea based on the plaintiff's self-described symptoms to their physician was insufficient. And in Neely, the doctor in that case had actually indicated that the plaintiff suffered from insufficient sleep syndrome and probable obstructive sleep apnea. Also, the district court here applied a standard that is consistent with the ADA Amendments Act and correctly determined that Barlia had failed to establish that she was disabled. In fact, Judge Rosen noted the ADA Amendments Act. As Tenney purported regarded as claim, we think that's outside the jurisdiction of this court as it was outside the jurisdiction of the district court. Ms. Barlia did not allege it in her charge. She did not allege it in her complaint. She did not testify to it at her deposition. It is simply relegated to a two-sentence footnote in her opposition to MWI's motion for summary judgment. Also, with respect to that claim, there's no evidence in the record at the district court level with respect to any evidence that Walsh regarded her as disabled. The mere allegation that he may have been aware of certain symptoms is not sufficient to establish a regarded as claim. With respect to the contention of the EEOC that a regarded as claim no longer requires a showing that the individual is regarded as substantially limited in a major life activity, that's directly in contravention of this court's holding in Ferrari v. Ford Motor Company. Because a published decision of this court can only be reversed by an en banc panel, that decision is binding on this court as is the standard set forth in Ferrari. I'm sorry, what's the date of that opinion? It's a 2016. I'm just looking at your table of authorities and I didn't see it immediately. It's June 23, 2016. And it's F-E-R-R... F-E-R-R-A-R-I. And the EEOC acknowledges that in their briefing. Also, I'd point out, too, that this two-month transitory period that she was impaired for between the national sales meeting and when she is able to travel again is insufficient for a regarded-as claim because it's a six-month or less duration. Again, with respect to knowledge, Bar-Lea can't establish that MWI was aware at the time of the decision-making of her disability. Bar-Lea, prior to her termination, never referred to the issue that prompted her to miss the NSM as a disability or even a condition or disorder. She described it as issues, as did her physicians. Issues, symptoms with no diagnosis. With respect to the argument that she was not otherwise qualified for her position, to be qualified, she needed to perform the essential functions of her job consistent with MWI's expectations. Here, unlike in Wexler, it is undisputed that she was not meeting those objective qualifications in terms of the 95% monthly sales goal. In January 2014, she acknowledged to Walsh that she knew she was not growing at a rate that he would like to see, and so she was concerned about her job. In May of 2014, she sent an email to Walsh admitting that she was still struggling with her numbers or to make the numbers. With respect to the final element of a prima facie case, because this is a reduction in force case, she was not only required to show, she was required to establish that she was singled out for discharge for impermissible reasons, and for the retaliation piece, that her discharge was causally connected to her purported protective activity. Here, she was one of approximately 90 employees discharged. She was the only individual in her region on a PIP. She had consistently failed to meet the requisite 95% sales goal in 14 of the last 18 months, 7 out of 8 in fiscal year 2014. She had become disengaged from her position, did not sufficiently communicate to Walsh to show her efforts to improve. While Barley has cited Secluserman and has also cited a Bennet and Visser, those individuals, as I previously indicated, were not on a PIP, and they did not have her extensive history of 17, 18-month history of poor performance. What happened after... Part of her contention, though, is it's true that Clusterman was not on a PIP, but he should have been. That is not accurate, Your Honor. Clusterman was a new hire. He was a new employee getting ramped up. Barley's counsel is citing two performance numbers post Barleya's termination. This Court is limited to looking at the information that was before MWI at the time of Barleya's termination, not what happened after in terms of Mr. Clusterman's performance, but what MWI actually had available to it at the time of her separation. Also, her true comparator is really Bolton Ukele. He is an employee who had been employed for approximately the same duration of time. He had more accounts, when you look at dollars, removed from his territory in the 2013 realignment than she did. He performs fine. Also, her downward spiral started before the territory adjustment even happened in terms of not meeting that 95% sales-to-goal expectation. In effect, all Barleya is able to show is timing here. This happened after she requested to miss the NSM, not because of it, but timing alone is certainly insufficient. Also, when assessing an employer's legitimate nondiscriminatory business reason, courts can't second-guess the employer's stated reason. Here, it's undisputed that she had failed to meet these sales numbers for an extensive period of time, that she was the only individual on a PIP, and that Clusterman is not similarly situated to her. Accordingly, for all the reasons stated in our brief, and here on the record, we request that the court affirm Judge Rosen's decisions. Thank you. The appellee acts as if Mr. Clusterman was a new employee in his ramp-up phase. That is not supported by the record. Mr. Clusterman was hired in February of 2013. Ms. Barleya was placed on the PIP more than a year later, in May of 2014, and ultimately terminated 15 months later. So Mr. Clusterman had plenty of time to get up to speed, and all the court needs to do is look at the objective numbers here. For each of those months that Mr. Clusterman was employed, Ms. Barleya outperformed him. Her performance evaluation, her final performance evaluation, was a 2.4 out of 3, exceeding the minimum level of expectations. Mr. Clusterman's was always below expectations. With respect to the communication... 2.4, am I right? That was the overall rating. Her quantitative rating was lower. There was a 1.87. Is that the right number?  but that also cuts against the appellee's argument that she was struggling with her communication skills. I was going to ask you, what did she have that brought the average up? Is this a numerical totaling of some sort? What brought her average up is the more subjective measures. The things like, how well do you get along with people? How well do you communicate? Is there a document in the record that all these numbers come from? Yes, we have attached those performance evaluations to the record. Finally, with respect to the defendant's reliance on Neely, that reliance is misplaced. The facts in that case were remarkably different than the facts here. Mr. Neely went to his primary care doctor and claimed that he had sleeping difficulties. The primary care doctor did not diagnose him, but instead referred him to a sleep specialist. Mr. Neely refused to go to the sleep specialist and refused to seek additional medical care. Barlia's case is different because she continually sought medical care for the condition that existed since 2010. Thank you. Thank you, counsel. The case will be submitted.